UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL  BARNES, | ) | |
| *et al.* | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:12-cv-01468-SEB-DKL |
| | ) | |
| SVC MANUFACURING, INC., | ) | |
| *et al.* | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This cause is now before the Court on the two motions for summary judgment

filed by Defendants Local Union No. 1999 of United Steel Workers ("the Local Union")

and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial

and Service Workers International Union ("the International Union") (collectively, "the

Union") [Docket No. 166] and Defendants PepsiCo, Inc. ("PepsiCo") and SVC

Manufacturing, Inc. ("SVC") (collectively, "the Company") [Docket No. 169], both filed

on August 29, 2014, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Plaintiffs Michael Barnes, Florajean Clark, Wesley Cobb, Chester Combs, Carol

Darden, Reontha Davison, Latonya Dickerson, Terry Elliot, Brenda Hamilton, Tavares

Harney, Mark Holt, Kimberly Hunt, Timmy Johnson, Trina Johnson, Darryl Jordan,

George Lewis, Anthony Liggins, Lynell Love, Jason Moore, Melna Rogers, Sean Rollins,

Kimberly Sholar, Sylvia Smith, Pam Turner, Lashawn Vaughn, Ginger Woods, Vanessa

Wright, Charles Weathers, and Robert Bentley, bring this hybrid action under Section

301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, against the Union and the Company, alleging that the Company breached its collective bargaining agreement by terminating them without just cause and that the Union breached its duty of fair representation in the handling of Plaintiffs' grievances.[1]

For the reasons detailed in this entry, we <u>GRANT</u> the Union Defendants' Motion for Summary Judgment and <u>GRANT</u> the Company's Motion for Summary Judgment.

**<u>Factual Background</u>**[2]

**A.      Background of the Parties**

SVC is a wholly-owned subsidiary of PepsiCo.  SVC manufactures Gatorade and Gatorade-related products at its Indianapolis facility.  SVC's business is somewhat seasonal – in cooler months, the demand for Gatorade decreases and in warmer months, the demand increases.  During periods when the demand for Gatorade is lower (which is usually from October through January), SVC typically temporarily shuts down one or more of its production lines, resulting in weekly employee layoffs.  During these layoffs, employees frequently file for unemployment benefits to provide income when they are not otherwise working at the facility.  For several years, SVC employees have filed for unemployment during weeks in which they are laid off from work.  Leese Decl. ¶¶ 5-6.

---

[1] Plaintiffs originally alleged additional claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Family Medical Leave Act, but on August 8, 2014, the Court granted the parties' joint stipulation of the voluntary dismissal of those claims.

[2] In many instances, Plaintiffs have mischaracterized or misquoted deposition testimony or included unsupported allegations or improper argument in their factual recitation.  We have included only those facts that are relevant to the dispute and supported by the record.

During the relevant time period, Bob Badgley served as the Company's Head of Human Resources until early 2012, at which point Sarah Leese took over the position.

Plaintiffs are twenty-seven (27) former employees who worked in the production and distribution departments at SVC's Indianapolis plant. One of the plaintiffs, Jason Moore, is white; one plaintiff, Melna Rogers, is Asian; the remaining plaintiffs are African-American. Plaintiffs, along with twenty-eight (28) other employees, were terminated in 2012, purportedly for falsifying unemployment documents. *Id.* ¶ 7.

Throughout their employment, Plaintiffs were members of both the International Union and the Local Union. The Local Union also represents employees at eleven other employers in central Indiana. Jones Decl. ¶ 2-3, 17. The SVC employees are part of the SVC unit of the Local Union. Reed Decl. ¶ 14. At the time of Plaintiffs' terminations, James "Jim" Adcock was a Staff Representative with the International Union, Bruce Reed was the Business Representative of the Local Union, and Chuck Jones was the Local Union President. Some SVC employees also held positions with the Union during the relevant time period. From 2009 to approximately April 2012, Dave Keen was the SVC Unit President and Carleen Ammons was the SVC Unit Vice President. From April 2012 to the present, Richard Moon has been the SVC Unit President and Eugenia Benson the SVC Unit Vice President. In 2012, Ms. Benson also served as one of a group of unit grievance committee members. Mr. Keen and Mr. Moon are white. Both Ms. Ammons and Ms. Benson are African-American.

**B.    Relevant Employment Policies and Procedures**

As members of the Union, Plaintiffs' employment was covered by the terms of a collective bargaining agreement ("CBA") between SVC and the Union.  The 2010-2013 CBA was negotiated by Mr. Adcock, Mr. Reed, and SVC management.

Article V of the CBA provides that management may discharge employees for "just cause."  Exh. C to Adcock Decl.  Article XVIII of the CBA provides that the Company "reserves the right to make and publish reasonable rules not inconsistent with the terms of this Agreement" and that "[v]iolations of such rules shall constitute reason for discipline, suspension, or dismissal; subject, however, to the grievance procedure in accordance with Article VII."  Exh. A. to Pls.' Compl. at 52.

The Company exercised its right under Article XVIII to "make and publish reasonable rules" by establishing policies and procedures in its "Associate and Salaried Resource Manual" ("the Manual").  The Manual contains a list of Plant Rules that provide that employees who violate the Plant Rules "shall subject themselves to disciplinary action including discharge."  Exh. A to Leese Decl. at 16.  The first rule identified in the Plant Rules ("Plant Rule No. 1") prohibits falsification of information and records.  Specifically, the rule prohibits "[f]alsifying any information, reports or records, including but not limited to personnel, time sheet, absence, sickness, injury, or production records."  *Id.*  This rule applied to all employees at SVC's Indianapolis plant, including all Plaintiffs.  The Manual contained a progressive discipline policy, but also stated: "The Company reserves the right to take the necessary disciplinary actions, up to and including termination, depending on the severity and/or frequency of the incident(s)." *Id.* at 21.

4

Article VII of the CBA contains SVC's grievance and arbitration procedure. Under Article VII, any differences arising between the Company and the employees are subject to the terms of the procedure. The procedure consists of four steps, culminating in binding arbitration. Specifically, the CBA provides: "If the matter in controversy is not settled in the proceeding STEP, the grievance may be referred to arbitration as hereinafter set out." Exh. A to Pls.' Compl. at 13. Grievances challenging terminations may be taken directly to the third step of the process. The CBA also provides that terminated employees may not be present at the third step meeting. Keen Dep. at 15; Reed Dep. at 34; Reed Decl. ¶ 20. Because the CBA contains a "just cause" standard for discipline, in cases challenging a particular disciplinary action, the Union must prove to an arbitrator that the Company's action lacked "just cause." Adcock Decl. ¶ 90; Reed Dep. at 84.

**C.    SVC Discovered Evidence of Unemployment Fraud**

In late 2011, an African-American SVC employee (who is not a plaintiff in this action) was investigated by the State of Indiana for unemployment fraud. Nancy Butler, an investigator with the Indiana Department of Workforce Development ("DWD"), conducted the investigation and determined that the employee had fraudulently filed for and collected over $20,000 in unemployment benefits while working for SVC. Leese Decl. ¶ 17; Butler Dep. at 9, 45-46, 49. The DWD informed SVC of the fraud and instructed it to report any other employees who were fraudulently filing for unemployment. Leese Dep. at 46-47, 59. Upon receiving this information from the DWD, SVC terminated the employee for falsifying unemployment documents, having

5

determined that his actions constituted a violation of Plant Rule No. 1 prohibiting falsification of documents.  During his termination meeting, he informed SVC that other employees were also engaging in the same conduct.  Leese Decl. ¶ 18; Leese Dep. at 58-59.  The following day, the Union filed a grievance challenging the employee's termination.  Reed Decl. ¶ 32.

In January 2012, SVC received an anonymous complaint through its "SpeakUp" hotline[3] identifying approximately seventeen employees whom the anonymous caller alleged were claiming unemployment benefits during times when they were actually working.  Leese Dep. at 46-47, 58-59; Exh. B to Leese Decl.  Upon receiving the complaint, SVC provided Ms. Butler with a list of names identified in the SpeakUp report as it had previously been instructed by her to do.  Leese Decl. ¶ 20; Leese Dep. at 46-47; Butler Dep. at 46-47; Exh. 4 to Butler Dep.  Mr. Badgley, who was then SVC's Senior Manager of Human Resources, informed Local Union Representative Reed that an investigation would ensue and that he would keep Mr. Reed informed as the investigation progressed, but Mr. Badgley did not identify the SVC employees whom the anonymous caller had accused of unemployment fraud.  Reed Decl. ¶¶ 35-36.

Following receipt of this information, Ms. Butler examined the employment records of the seventeen employees and, after conducting investigatory interviews, determined that five of them had knowingly misrepresented or failed to disclose material facts in connection with their unemployment claims.  Two of those five employees

---

[3] The Speak-Up line is a telephone number that SVC employees can call to inform the Company of issues or concerns.  Cobb Dep. at 84-85.

resigned during the investigation and SVC terminated the remaining three employees for violation of Plant Rule No. 1.  The remaining twelve employees, nine of whom were African-American, were cleared by the DWD and not terminated by SVC.  Leese Decl. ¶ 21.

**D.    SVC Conducts Unemployment Claim Audit for all Employees**

In light of these events, SVC decided to audit the entire plant in order to determine whether any other employees were engaging in unemployment fraud.  SVC notified the Union that it was preparing to conduct a formal audit of every employee at the Indianapolis plant.  Leese Dep. at 46-47, 199-200; Leese Decl. ¶ 22.

Mr. Badgley began collecting documents necessary to the audit process.  He requested unemployment records from TALX, the third-party administrator that handled SVC's unemployment claims.  TALX provided spreadsheets containing a list of all SVC employees who had filed for unemployment during the prior two years (2010 and 2011), the date(s) on which each employee filed a claim, the amount of unemployment benefits paid by the State, and the amount of any earnings paid by SVC during each benefit week. Leese Dep. at 25-26; Leese Decl. ¶ 23.  Mr. Badgley gathered additional information showing when employees were scheduled on layoff and thus eligible to collect unemployment as well as "punch edit" records documenting when employees were physically in the plant so he could verify the layoff data.  Leese Dep. at 25-26.

After receiving the unemployment data from TALX, Mr. Badgley and SVC's Human Resources Manager Sarah Leese requested that TALX representatives come to the plant in person to discuss the data.  In February 2012, Mr. Badgley, Ms. Leese,

Human Resources Coordinator Shannon Jackson, Payroll Coordinator Kelly Haywood, and two subject-matter experts from TALX completed a two-day review of the 2010-2011 unemployment data, layoff lists, payroll records, and punch edit data for each of SVC's employees.  Leese Dep. at 24-25, 32-33, 48, 50-51.  According to Ms. Leese, they reviewed both the layoff lists and the punch edit data because she believed "it was important, recognizing the magnitude of this investigation, that we gather any … and all information that would be available to us to ensure that, you know, we were looking at accuracy."  Leese Dep. at 40.

As a result of the company-wide audit, SVC determined that many employees had unemployment discrepancies ranging from one week to 39 weeks during which two-year period potentially fraudulent unemployment claims had been filed.  Specifically, the record reflects that approximately 95 employees had received unemployment benefits during weeks when they were not on layoff.  In other words, these employees were simultaneously receiving unemployment benefits and wages from SVC.  Leese Decl. ¶¶ 24-25.

**E.    SVC and the DWD Investigated Unemployment Fraud**

Following completion of the audit, SVC provided Ms. Butler with a list of the 95 individuals regarding whom SVC had found discrepancies in unemployment data.  Leese Dep. at 65-66.  Ms. Leese also provided Ms. Butler with all of the data SVC and TALX had used to identify the discrepancies, including the layoff lists, punch list data, and the spreadsheets containing the unemployment claims for every SVC employee from 2010 and 2011.  Leese Dep. at 53-54, 146-47; Leese Decl. ¶ 26.  Given the significant number

8

of employees who were under investigation, Ms. Leese requested that the DWD investigate groups of employees in waves to allow the plant to continue operating, and, because SVC produces a consumable food product, to avoid any potential health or safety threats.  Leese Dep. at 116-17; Leese Decl. ¶ 28.

Upon receipt of this information, Ms. Butler began her investigation.  Ms. Butler informed Ms. Leese on a rolling basis when particular groups of employees were going to be investigated by her office for unemployment fraud.  SVC would then notify those identified employees that they were suspended pending the State's investigation and inform them that they had to await the outcome of the DWD's decision, at which point they would have an opportunity to discuss the situation further with Ms. Leese.[4]  Ms. Leese informed each employee that, in the event the Company ultimately found that the employee did not knowingly receive unemployment overpayments, he or she would receive back pay for the hours of work missed during the suspension.  Keen Decl. ¶ 42; Moon Decl. ¶ 18; Roell Decl. ¶ 10.  A Union representative was present during as many of the suspension meetings as possible, unless representation was declined by an employee.  Keen Decl. ¶ 41; Moon Decl. ¶ 18.

As part of her investigation, Ms. Butler reviewed unemployment claims filed by the employees and worked with SVC to collect relevant payroll data.  She also conducted in-person interviews with employees or mailed documents to employees to collect their

---

[4] Once an employee was suspended, he or she was locked out of the company premises and computer system and was not allowed to check data that was in the unemployment system or check the layoff lists.  Keen Dep. at 132.

written statements.  Butler Dep. at 11.  During the interviews, Ms. Butler reviewed with the employee the weeks he or she received unemployment benefits, allowing the employee the option to fill out a sworn written statement, make a verbal statement, or decline to provide a statement.  Exh. 6 to Johnson Dep.; Exh. G to Adcock Decl.  During their interviews, some employees reported to Ms. Butler that a former Human Resources Manager at SVC had told them that they could collect unemployment during weeks when they had received holiday pay.  Butler Dep. at 24.  In light of this information, Ms. Butler excluded from consideration any holiday pay weeks in her determination of whether an employee had knowingly misrepresented or failed to disclose material facts.  *Id.* at 24-25.  During the investigation, some Plaintiffs expressed confusion, indicating to Ms. Butler that SVC should have provided training on unemployment issues.

Ms. Butler focused primarily on the employees' responses on their unemployment claim forms in determining whether a particular employee knowingly misrepresented or failed to disclose material facts.  When an individual files an unemployment claim, he or she is required to report any earnings for the week for which unemployment is claimed and answer the question: "Did you work?"  The process is completed online and the last step requires the individual to certify that the information provided in the form is true.  Butler Dep. at 16-63; 158-59; Exh. 23 to Butler Dep.  Contact numbers are provided on the website if employees require assistance completing the form.  Butler Dep. at 62-63.

The questions on the online application form for unemployment included the following:

Do you want to file for the week ending [MM/DD/YY]?          ___ Yes   ___ No

| | |
|---|---|
| Did you work? | ___ Yes  ___ No |
| If you worked, how much did you earn for the week? | _____ |
| Did you/will you receive holiday pay? | ___ Yes  ___ No |
| Did you/will you receive severance or vacation pay? | ___ Yes  ___ No |

Exh. 23 to Butler Dep.  The online voucher certification form requires the applicant to certify as follows:

> I certify that I have reported any and all work, earnings, and self-employment activity for this week, even though I may not have yet been paid. … I certify that all answers and information given in this application for benefits are true and accurate.  I am aware that if I knowingly fail to disclose information or give false statements to receive unemployment benefits, I may lose my unemployment benefits, be required to repay benefits received improperly with interest and penalty, and may be subject to civil and criminal prosecution.

Exh. 24 to Butler Dep.

Ms. Butler testified that her decision that a particular employee had engaged in knowing misrepresentation or had failed to disclose material facts turned on whether the employee knew or should have known that he or she worked during the week in question. Butler Dep. at 65-68.  Ms. Butler rendered a decision on each of SVC's employees, all of which were reviewed by her supervisor.  *Id.* at 12.

As the DWD issued its decisions on SVC's employees, those determinations were conveyed to SVC.  Ms. Butler testified that the results of her investigation were sent to SVC "[b]ecause they're an interested party.  They are – they're the employer.  Their account is being charged, their experience – unemployment account is being charged.  So the employer always has a right to know."  *Id.* at 18.  Later in her deposition, Ms. Butler

11

clarified this testimony, explaining that she meant that unemployment fraud would affect

SVC's unemployment experience tax rate.  *Id.* at 59-60.  Ms. Butler further testified that

the DWD does not send its investigator reports to employees in every case, but that the

DWD provides the forms if the employer requests them.  *Id.* at 18.

## F.    SVC Terminated Employees for Unemployment Fraud

When Ms. Leese received a DWD determination for a particular employee, she

called the employee back to the plant from suspension to discuss the determination.

Some employees attended the meeting, some declined a meeting or chose not to respond,

and others preferred to conduct the meeting over the telephone.  Leese Dep. at 57-58, 43-

44; Leese Decl. ¶ 30.  According to Ms. Leese, during those individual employee

meetings she reviewed the DWD's determination and also discussed SVC's own

investigation and findings.  She also reviewed the weeks in question with the employee,

comparing the number of weeks the employee was on layoff for 2010-2011 to the number

of week of unemployment payments he or she collected.  Every employee was given an

opportunity to respond to the findings, explain discrepancies, and point out any

information that was inaccurate.  Leese Dep. at 43-44, 79-82, 79-80.

In some cases, employees raised questions about specific information in the DWD

determination which Ms. Leese cross-referenced with payroll and time clock information

to ensure accuracy.  Leese Dep. at 80.  Other employees expressed confusion regarding

filing for unemployment while also receiving holiday pay and in those cases Ms. Leese

omitted from consideration any such weeks as part of her investigation.  *Id.* at 98-99.

Some SVC employees admitted to the falsification, but most Plaintiffs claimed that they

did not intend to falsify information. *Id.* at 94; Leese Decl. ¶ 30; Reed Dep. at 59. Plaintiffs do not dispute, however, that the DWD ultimately determined that all of them had knowingly misrepresented or failed to disclose material facts on their unemployment forms.

According to Defendants, when Ms. Leese conducted the individual employee interviews, a Union representative was in most cases either present during the interview, or, in the case of telephone interviews, on the phone during the meeting, unless an employee specifically declined representation or the employee declined a meeting altogether. Leese Dep. at 197-199. The current SVC Unit President (either Mr. Keen or Mr. Moon) and Union Steward Ed Roell took turns attending the meetings, depending on their availability. Keen Decl. ¶ 48; Moon Decl. ¶ 19; Roell Decl. ¶ 12.

Ms. Leese testified that the Union representative would request clarification when necessary during the meetings and at times reiterated the Union's general request that employees be allowed to make repayments for any unemployment overpayments that had been received. Leese Dep. at 196-97. During the investigative meetings, Mr. Keen advised employees to contact the Union hall if they had any questions or needed additional assistance from the Union. Keen Decl. ¶ 58. Ms. Leese recalled Mr. Keen's providing employees with his personal cell phone number so they could call him after the meeting. At the meetings he attended, Mr. Keen occasionally asked for a moment to discuss an issue with an employee following a suspension meeting, and Ms. Leese always gave them time alone to do so. Leese Dep. at 199, 202.

Plaintiffs, however, contend that the Union representatives said nothing at their meetings and provided no assistance to them.  Plaintiffs Hunt, Johnson, Clark, and Vaughn testified by affidavit that they had no Union representative present at the meeting with Ms. Leese.

After attending the employee meetings, either Mr. Keen or Mr. Moon provided Mr. Adcock and Mr. Reed with an oral report of what had transpired.  Mr. Roell reported to Mr. Keen or Mr. Moon the substance of the meetings he attended.  Keen Decl. ¶¶ 57, 60; Moon Decl. ¶¶ 29, 36.  Mr. Reed testified that these reports reflected that certain employees did not attend their individual meeting, and that those who did attend provided only the same information and explanations that had previously been considered and rejected by the DWD.  Reed Dep. at 52.

After each round of interviews, Ms. Lease prepared and provided interview summaries as well as a recommendation regarding discipline for each employee to SVC's Plant Director, Edwin Wiley, and Human Resources Director Andrea Coons.  Ultimately, Ms. Leese recommended the termination of many employees for falsification of unemployment documents based on their violation of Plant Rules.  According to SVC, Mr. Wiley and Ms. Coons made the final termination decisions, although they followed all of Ms. Leese's recommendations.  Leese Dep. at 54-55.  Ms. Leese, Mr. Wiley, and Ms. Coons discussed the potential for applying progressive discipline, but ultimately decided that unemployment fraud was a sufficiently severe offense to warrant immediate termination.  *Id.* at 165-66, 174-75.  After the termination decisions were final, Ms. Leese informed Mr. Reed.  Reed Decl. ¶ 66.

14

In their original investigation, the DWD chose not to investigate SVC employees with only minimal discrepancies in their paperwork, opting instead to simply issue to them overpayment letters.  Similarly, SVC chose not to interview or otherwise investigate these employees.  However, SVC did investigate every employee whom the DWD interviewed and formally investigated.  Leese Dep. at 80-81, 84-85.  SVC ultimately terminated every employee whom the DWD had found to have knowingly misrepresented or failed to disclose material facts on their unemployment forms.  SVC's justification for each of those terminations was the violation of Plant Rule No. 1.  *Id.* at 80-81.

After the DWD completed its review of the 95 employees with unemployment discrepancies, the DWD and SVC closed their respective investigations.  In the end, 53 of the 95 employees were terminated for unemployment claims falsification.  Some of the terminated employees were certified to take leave under the FMLA while others had never taken FMLA leave.  Some of the terminated employees had previously served as Union officers or had recently been elected to a Union position.  Employees of all races, including white, African-American, Asian, and Hispanic, were terminated.  The State of Indiana pursued some of those employees for criminal prosecution.  The remaining 37 employees (of all races) were cleared of any fraud or falsification and allowed to return to work.  Leese Decl. ¶¶ 31-32.

**G.      The Union's Actions During SVC's Investigation**

From the beginning of SVC's investigation into unemployment benefits fraud within the Company, Local Union Business Representative Reed requested that the

Company offer a process through which employees who had received unemployment overpayments could voluntarily self-identify and then make repayments to the DVD in lieu of termination. Leese Dep. at 196-97. Mr. Reed testified that he hoped the Company "would agree to stop investigating and disciplining employees so that the employees who had issues relating to unemployment overpayments could take care of [those] issues with the DWD." Reed Decl. ¶ 42. Mr. Badgley took Mr. Reed's request under advisement, but the Company ultimately declined to offer such an option, citing the severity of the misconduct.

According to the Union, as soon as it was informed of the Company's investigation, the Union warned employees not to engage in unemployment fraud and advised them that "if you have and you can fix it, go down and fix it before the company investigates." Reed Dep. at 55-56. On numerous occasions SVC employees asked SVC Unit President Dave Keen about the Company's investigation about which Mr. Keen testified that he always advised "if an employee had an issue with respect to unemployment overpayments, then the employee should immediately take steps to address those issues with the DWD." Keen Decl. ¶ 40. For example, Plaintiff Michael Barnes who is African-American testified that Mr. Keen specifically advised him to repay any overpayments. Barnes Dep. at 50-51. Other Plaintiffs testified that Mr. Keen warned a group of employees of all races to go to the unemployment office and repay any amounts owed. Dickerson Dep. at 23-24, 106. Mr. Keen advised employees to try to make repayment arrangements with DWD if possible because he believed it put them in a

16

"safer position" by having attempted to correct any overpayments before they were officially investigated by the Company.  Keen Decl. ¶ 40.

Throughout SVC's investigation, the Union frequently requested information and updates from the Company and also hosted a meeting at the Union hall to discuss the situation with the employees in March or April 2012.  Local Union President Chuck Jones, SVC Unit President Keen, SVU Unit Vice-President Carleen Ammons, and several employees, including Plaintiffs Harney, Sholar, Hunt, Rollins, Smith, Vaughn, and Jordan, were present at that meeting.  Jones Dep. at 56-58.

During the meeting, Mr. Jones informed the employees that Ms. Leese had informed the Union that employees brought back from suspension following the Company's investigation would receive backpay, so there was nothing about the suspensions to grieve.  Jones Dep. at 57-58; Jones Decl. ¶ 23; Keen Decl. ¶ 45.  The Union representatives also informed employees that they were "going to see what they [could] do" about the Company's unemployment fraud investigation and any discipline arising therefrom.  Sholar Dep. at 13.  Mr. Keen and Mr. Jones both stated that the Union would file grievances in protest of any terminations.  Hunt Dep. at 142; Johnson Dep. at 87.  However, according to Mr. Jones, he also advised the employees that if they actually committed fraud while applying for unemployment benefits, it would be very difficult for the Union to help them get their jobs back.  Jones Decl. ¶ 23.  Mr. Jones told the employees who attended the meeting that he would help them find jobs if they were terminated by SVC.  Vaughn Dep. at 78-79.

Some of the employees at the meeting asked why only minorities were being terminated.  In response, Mr. Jones stated that it was the Company, not the Union, that decided who to investigate and discipline and that the Union had no say in those decisions.  Mr. Jones expressed anger at the implication that he and the Union's officers and representatives were racist and stressed to the employees present at the meeting that the Union's actions were not racially motivated.  Jones Decl. ¶ 24.

The Union also included announcements about SVC's unemployment fraud investigation at the Local Union's monthly meetings.  Reed Dep. at 55-56.  These meetings occurred every third Sunday of the month, and each January the schedule for the ensuing year's meetings, including any variations, was posted in the Local Union hall.  Adcock Dep. at 65.  At the May 2012 meeting, International Union Staff Representative Jim Adcock reported that the Union was withdrawing certain grievances filed in protest of the terminations of SVC employees who knowingly received overpayments because those employees had admitted to receiving the overpayments and the Union believed therefore there was no merit to the underlying grievance.  Exh. 6 to Adcock Dep.  This issue was also discussed at the June 2012 meeting.  Exh. 7 to Adcock Dep.  At both meetings, Mr. Adcock advised employees to address any issues they might have regarding unemployment overpayments with the DWD.  Adcock Decl. ¶ 52.  According to Mr. Reed, he "specifically let members know about the investigation in Local 1999 monthly membership meetings" and instructed employees "not to commit unemployment fraud and advised them that they could be disciplined by their employer for doing so." Reed Decl. ¶ 46.

**H.      The Union Filed Grievances**

Following SVC's investigation and disciplinary determinations, the Union filed

grievances for all employees terminated for unemployment falsification, including all

Plaintiffs, even in cases in which an employee did not request that a grievance be filed on

his or her behalf or did not want Union representation.[5]  Keen Dep. at 11; Adcock Dep. at

15-16.  According to Mr. Keen, the initial filing of grievances is "automatic" in any

termination.  Keen Dep. at 24-25.  The Union did not directly talk to each and every

grievant throughout the process because, as Mr. Adcock testified, he did not believe it

was necessary.  Adcock Dep. at 86.  Eugenia Benson, an African-American unit

grievance committee member during the relevant time period, testified that there were

times when she did not speak directly with a grievant when processing the grievance and

other times when the grievant would not even have known that the Union had filed a

grievance on the employee's behalf.  Benson Dep. at 22-25.

Each grievance alleged that the terminated employee was unjustly terminated and

requested reinstatement.  Exh. F to Adcock Decl.  These grievances were discussed

during third step meetings between the Union and the Company.[6]  Because employees

were terminated in groups, multiple third-step meetings were held in order to cover all of

the grievances for SVC employees who were terminated as a result of the unemployment

---

[5] This included grievances for white, African-American, Hispanic, and Asian employees.
[6] According to the Union, in termination cases, grievances are automatically advanced to the
third step of the grievance process.  Adcock Dep. at 73-74.  Plaintiffs contend this is not
explained in the Union contract and that SVC employees were never told that this was the
procedure.

investigation and several individual grievances were discussed at each meeting.  Under

the CBA, the terminated employees were not permitted to attend the third-step meetings.

Ms. Leese testified that at the third-step meetings, she "shared the determination

from the State, … the summary page that indicated weeks of layoff and weeks of

unemployment, … the summary of [Leese's] interview with the employee, and then the

employment decision and termination letter" for each SVC employee who had been

terminated.  Leese Dep. at 204-05.  However, Ms. Benson, an African-American Union

representative who sat in on the third-step meetings, testified that the only documents

presented at those meetings were the grievances.  She contends she never reviewed or

saw any documents from which she could determine the number of weeks of falsification

at issue.  Benson Dep. at 25-28.

According to SVC, each employment decision was reviewed individually at the

third-step meetings, and, following this review, each of the grievances was denied.  *Id.* at

205.

## I.    Union Leadership Reviewed Merits of Grievances

After the third-step meetings, Mr. Reed requested additional information to

substantiate the Company's position that the employees had falsified unemployment

documents.  In response, the Company sent to Mr. Reed and the Union a packet of

information on each specific employee who had been terminated, which compilation

included the DWD's determination that the terminated employee had fraudulently

received unemployment overpayments.  According to the Union, following Mr. Reed's

review of the information he met with Mr. Adcock[7] to discuss whether to appeal any of the employees' terminations to arbitration, the final step of the CBA's grievance procedure.  Reed Dep. at 9-11.  The final decision as to whether to appeal a grievance to arbitration or withdraw it rested with Mr. Adcock, who had not attended the third-step meetings.  According to Mr. Adcock, before making his decision regarding a particular grievance, he regularly discussed the pending grievance with Mr. Reed.  Adcock Decl. ¶¶ 9, 84-86.

At the time of these events, Mr. Adcock was an experienced union official, having processed and managed grievances for eighteen years, having previously arbitrated cases involving employee discipline and termination, and having researched "numerous arbitration decisions and arbitration issues, including decisions and issues related to discipline, termination of employees and the interpretation of contract language." Adcock Decl. ¶¶ 10, 12; Adcock Dep. at 26.  Mr. Reed accrued thirteen years of experience with union grievance procedures and testified that he was familiar with arbitrating cases involving "discipline, termination of employees and the interpretation of contract language."  Reed Decl. ¶ 10.  Both officials were familiar with SVC's CBA.  *Id.* ¶ 18; Adcock Decl. ¶¶ 20-21.

Mr. Adcock and Mr. Reed also both testified that they hoped to identify one grievance with favorable facts in order to arbitrate that grievance as a "test" case, which hopefully would provide the Union with "some leverage with respect to the remaining

---

[7] Both Mr. Reed and Mr. Adcock are white.

termination grievances."  Adcock Decl. ¶ 119; Reed Decl. ¶ 93.  According to the Union,

Mr. Reed and Mr. Adcock met ten to fifteen times to discuss each grievance individually.

They considered several factors in assessing each grievance, particularly whether Plant

Rule No. 1, the rule all of the terminated employees were found to have violated, applied

to the situation at hand.  Mr. Adcock and Mr. Reed jointly concluded that Plant Rule No.

1 was "broad enough" to apply to the DWD employment claim forms the terminated

grievants were found to have falsified, reasoning that the rule did not contain language

limiting its application solely to internal Company documents.  Adcock Decl. ¶¶ 97-98;

Reed Decl. ¶ 87.  Mr. Adcock further testified that it was his belief that an arbitrator

"would conclude that the falsification rule applies to the falsified DWD claim forms

because these forms are significantly related to the employees' employment relationship

with SVC."  Adcock Decl ¶ 99.

Upon concluding that Plant Rule No. 1 was applicable to falsification of

unemployment claims, Mr. Adcock and Mr. Reed next considered whether the Company

had "just cause" for terminating employees for a violation of Plant Rule No. 1, as

required by the CBA.  Mr. Adcock and Mr. Reed testified that in making this

determination, they considered the specific facts underlying each termination, including

the relevant documents received from the Company in response to the Union's

information request as well as the reports received from Mr. Keen, Mr. Moon, and Mr.

Roell regarding what they witnessed in the investigatory meetings they attended.  Adcock

Decl. ¶ 89; Adcock Dep. at 127.

Mr. Adcock and Mr. Reed both testified that they also reviewed each grievant's explanations to the DWD for receiving unemployment overpayments, which included: confusion over holiday pay (Exh. G to Adcock Decl. at 10-11 (Darden), 16-17 (Elliott), 21-22 (Harney), 33 (Liggins), 40-41 (Rollins)); confusion regarding the questions on the claim form or about the time to file (*id.* at 10-11 (Darden), 12-13 (Davison), 16-17 (Elliot), 32 (Lewis), 44-45 (Smith), 46-47 (Turner); having had someone else file the form for them (*id.* at 3 (Barnes), 7 (Cobb), 27-28 (Timmy Johnson)); incorrectly applying for unemployment benefits so that benefits would not be delayed or stopped (*id.* at 8-9 (Combs)); that the employee simply made an error (*id.* at 8 (Combs), 36-37 (Moore), 40-41 (Rollins), 49 (Woods)); having received improper training from the Company on how to apply for unemployment benefits (*id.* at 21-22 (Harney)); being unaware that they had to report their earnings (*id.* at 4-5 (Clark); 25-26 (Hunt)); not recalling that they had filed vouchers for the weeks in question (*id.* at 38-39 (Rogers)); and mistakes caused by effects of medication (*id.* at 14-15 (Dickerson), 34-35 (Love), 42-43 (Sholar)).  Three Plaintiffs did not provide an explanation to the DWD.  *Id.* at 20 (Hamilton), 29 (Trina Johnson), 48 (Vaughn).  Upon review of this documentation, Mr. Reed viewed it as "very damaging because it established that the DWD found that the grievants had falsified their unemployment claims."[8]  Reed Decl. ¶ 84.  However, when asked at his deposition to recall specific employees who had indicated to the DWD that the discrepancies in their

---

[8] The DWD decisions include a date on which the determinations become final if not appealed. Plaintiff Holt was the only plaintiff who pursued an appeal of his DWD determination, which he ultimately lost.  Holt Dep. at 44.

unemployment documentation was the result of a mistake rather than intentional falsification, Mr. Adcock testified: "I just can't give you a specific case to say Employee X made that claim …." Adcock Dep. at 82.

**J.     The Union Withdrew the Grievances**

Following their review of the documents provided by SVC, Mr. Reed and Mr. Adcock made an individual decision on each terminated employee's grievance, ultimately concluding in each case that proceeding to arbitration, the final step in the grievance process, would be futile. Adcock Decl. ¶ 122. The Union therefore withdrew all of the terminated employees' grievances. According to SVC, both Mr. Reed and Mr. Adcock believed that the employees terminated for unemployment falsification had indeed violated SVC's Plant Rule No. 1 prohibiting falsification of documents. Their belief reflected the results of their review of the documents, which showed that the employees collected wages from SVC the same weeks that the DWD paid them unemployment. Reed Dep. at 14-15. They did not consider weeks during which minor discrepancies occurred attributable to holiday pay because, as noted above, some employees had expressed confusion regarding the appropriateness of reporting holiday pay.

With regard to their decision not to pursue arbitration, Mr. Reed testified that, based on his experience with arbitrations, he did not believe that it would make a difference to an arbitrator whether an employee claimed that he or she had made an honest mistake in completing unemployment paperwork. Specifically, Mr. Reed testified: "Well, basically after doing arbitrations, it's my belief that the arbitrators put

24

the responsibility of – if you fill out something and you sign it, that's the way it is.  If you

sign a document saying you understand the rules of conduct, whether you understand

them or not, you signed it, that's it."  Reed Dep. at 40.  Mr. Reed recalled reading

arbitration decisions in connection with other unemployment terminations where the

arbitrators held that employees are responsible for the documents they sign.  *Id.* at 82.

According to Mr. Reed, therefore, it was his opinion that "the proof that was provided by

the company was enough that I could not have overcome it in arbitration."  *Id.* at 93.

Mr. Adcock testified that he also believed that arbitration would be futile based on

his opinion that SVC's rule against falsification made no distinction between deliberate

and accidental falsification.  Adcock Dep. at 41-42.  He explained: "If I file for

unemployment and draw benefits and I worked the same time, then I falsified

information, so there is no distinction in my mind. … [I]n these cases, individuals made

financial gain by drawing unemployment benefits that they weren't entitled to while they

worked."  *Id.* at 42.

Once Mr. Adcock reached a final decision not to proceed to arbitration on any of

the terminated employees' grievances, he instructed Mr. Reed to send each grievant a

"withdrawal letter" explaining the decision.  Adcock Decl. ¶ 123.  The withdrawal letters

were mailed to each terminated employee, utilizing identical content in each, stating that

the Union had carefully reviewed the employee's record, applied the CBA, and

investigated the facts related to the employee's termination.  Exh. I to Adcock Decl.  The

letters also informed the employees that the Union had "determined that to pursue this

case further would be without merit" based "on the overall record, the way in which

arbitrators have decided cases similar to this in the past, as well as the effects on the remaining membership." *Id.*  Although Mr. Adcock had made the final decision to withdraw the grievances, all of the withdrawal letters were signed by Mr. Reed.  Mr. Reed also sent Ms. Leese a letter informing the Company that the Union was withdrawing the grievances on a non-precedential basis.  Reed Decl. ¶ 98.  The Union did not speak to or otherwise confer with the grievants individually before withdrawing their grievances.

Mr. Adcock testified in his deposition that race was not a factor in the Union's decision to withdraw Plaintiffs' grievances and that other than the plaintiffs whom he had met in person,[9] he did not even know the races of the others.  Adcock Dep. at 32, 153.  It is undisputed that the Union did file other grievances for the terminated employees, including Plaintiffs, requesting that the Company pay accrued but unused vacation pay that was allegedly due upon termination.  The Union negotiated with the Company and ultimately resolved those grievances to Plaintiffs' benefit.  Leese Decl. ¶ 33.

## K.     Plaintiffs' Allegations of Race Discrimination

According to the Company's documents, 59 employees were terminated in 2011-2012, including those terminated as a result of the unemployment investigation.  Of those 59 employees, 51 were African-American, 1 was Asian, 4 were Hispanic, and 3 were white.  In early April 2012, Plaintiffs began filing charges with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination related to their terminations

---

[9] Twenty-four (24) of the plaintiffs testified that they had never met Mr. Reed or Mr. Adcock.

for falsifying unemployment documentation.  Ms. Leese testified that at the time of her investigation of the matters at issue in this case she was aware of those filings with the EEOC.  No white employees were terminated for unemployment falsification until May 2012, which was after the Company had been informed of the EEOC charges.

At some point while the unemployment investigation was proceeding, Mr. Adcock received a letter from one of the terminated employees raising the issue of race in connection with the Company's termination decisions.  Mr. Adcock did not contact that employee to discuss the issue nor did he investigate the allegations set forth in the letter, despite the fact that the terminations at that point were still ongoing.  Adcock Dep. at 153-54; Exh. 14 to Adcock Dep.  Although Mr. Reed and Mr. Keen testified that none of the employees complained that racial bias had affected the Company's termination decisions, Plaintiff Hunt testified that SVC employees did raise the issue at one of the Union meetings.  Hunt Aff. ¶ 11.

SVC's former Human Resources Manager, Erric Beasley, testified that when he worked at the Indianapolis plant, there existed a "white union" and a "black union" and Mr. Adcock and Mr. Reed were part of the "white union."  Beasley Dep. at 83, 192.  According to Mr. Beasley, when he worked at SVC, the Union treated the grievances of white employees more favorably than the grievances of African-American employees and he recalled approximately six times that the Union pursued grievances for white employees but did not do so for African-Americans.  *Id.* at 21-22, 24, 192-93, 215-17, 221, 228, 231-32.  Mr. Beasley also testified that the Union worked with Mr. Badgley to discriminate against African-Americans, and, as a result, that a disproportionate number

27

of African-American employees were terminated during Mr. Beasley's tenure at the Indianapolis plant.[10]  *Id.* at 223-24, 226.  However, because Mr. Beasley left the Company in June 2009, more than two years before the events at issue in this litigation occurred, he lacks any direct, personal knowledge of the Company's unemployment investigation, resulting termination decisions, and/or the process the Union followed in handling the grievances of the employees terminated for unemployment falsification.

Ms. Benson testified that, historically, the Union was a "white boy club," and that, in 1994 and 1995, before she became involved with the Union, African-Americans received less favorable treatment than white employees.  However, Ms. Benson clarified that that characterization did not currently apply to the Union because "it's more – now it's diverse."  Benson Dep. at 78.  Ms. Ammons testified that she became involved with the Union because she believed that in the past there had been instances in which the Union filed grievances for some employees and not for others and that grievances for white employees were processed further than were African-American employees' grievances.  Ammons Dep. at 53-55.   When asked at her deposition if she believed that was the case with regard to this unemployment investigation, Ms. Ammons testified: "I don't even think it was an issue of race."  *Id.* at 72-73.

## L.      The Instant Litigation

---

[10] Plaintiffs cite additional testimony by Mr. Beasley on themes similar to those detailed above. However, much of that testimony is either inadmissible hearsay or nothing more than vague generalities and impressions about events that occurred more than two years before the events material to this litigation took place, and thus, is not relevant.

On October 10, 2012, Plaintiffs filed their Complaint in this action, which they amended on August 8, 2013.  On March 11, 2014, Plaintiffs filed their Second Amended Complaint, alleging various claims against the Company and the Union, including the two claims remaining in the litigation, to wit, a breach of contract claim against the Company and a breach of the duty of fair representation against the Union.  Both the Company and the Union have filed Motions for Summary Judgment, which are now fully briefed and ripe for ruling.

## **Legal Analysis**

### I.      **Standard of Review**

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See *id.* at 255. However, neither the mere existence of some alleged factual dispute between the parties, *id.* at 247, nor the existence of some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

29

The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

## II.   Discussion

Section 301 of the LMRA "allows a union member to seek relief in federal court when his union breaches its duty to represent him fairly." *Truhlar v. U.S. Postal Serv.*, 600 F.3d 888, 891 (7th Cir. 2010). To establish a breach of the duty of fair representation, a plaintiff must establish that the union acted in a manner that is

30

"arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). "'Each of these possibilities must be considered separately in determining whether or not a breach has been established.'" *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013) (quoting *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003)).  In a hybrid claim like Plaintiffs', which is brought against both the union and the employer, Plaintiffs' claims are "inextricably interdependent," meaning that in order to recover against either defendant, Plaintiffs must establish both that the union breached its duty of fair representation and that the employer violated the CBA.  *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65 (1983) (citations omitted).

Both the Company and the Union argue that Plaintiffs have waived their breach of contract claim by failing to address it other than in a singular reference to "breach of contract" in the introductory section of their response brief, and thus, that they therefore cannot prevail on their hybrid 301 claim.  Plaintiffs filed a surreply "to clarify that [they] are claiming a violation of the CBA's 'just cause' provision" and that any reference in their briefing to a lack of just cause "necessarily concern violations of the CBA and hence a breach of contract."  Pls.' Surreply at 1, 2.  It is true that Plaintiffs do reference the "just cause" standard set forth in the CBA at various points in their response brief, most directly in reference to the Union's failure to consider the "Seven Tests of 'Just Cause' for Discipline" before deciding not to pursue any termination grievances to arbitration.

However, nowhere in their response brief do Plaintiffs directly discuss their breach of contract claim, nor do they present any legal analysis or argument to rebut either the Union's or the Company's extensive breach of contract analysis.  Plaintiffs' failure to meaningfully address their breach of contract claim means that they have effectively waived this claim, and consequently, their hybrid 301 claim cannot survive.  *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) ("Because [the plaintiffs] did not provide the district court with any basis to decide their claims, and did not respond to the [defendant's] arguments, these claims are waived."); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver."); *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 173 n.1 (7th Cir. 1996) (argument waived where appellants "failed to develop the argument in any meaningful manner").

Even if we were to hold that Plaintiffs did not waive their breach of contract claim, the claim would nevertheless fail.  There is no dispute that the CBA permitted the Company to terminate employees for violations of reasonable workplace rules, including Plant Rule No. 1, prohibiting employees from "[f]alsifying any information, reports or records, including but not limited to personnel, time sheet, absence, sickness, injury or production records."  Exh. A to Leese Decl. at 16.  On its face, Plant Rule No. 1 covers falsification of any information, reports, and records, and does not expressly limit its coverage or otherwise exclude falsified unemployment documents or falsified documents submitted to outside entities.  Ms. Leese testified that the Company believed Plant Rule No. 1 applied to unemployment records because those records related to SVC as an

32

employer and impacted SVC's unemployment experience rate.  Leese Dep. at 167.

Although Plaintiffs presented testimony from three former SVC employees who could

not recall any employee previously being terminated for falsification of unemployment

records under Plant Rule No. 1, even if true, this fact has no impact on the Company's

right to apply the rule when the unemployment fraud at issue in this litigation was

discovered.

The fact that the Company did not apply progressive discipline before terminating

Plaintiffs and the other SVC employees found to have falsified unemployment documents

is also not evidence that the Company breached the CBA.  The Plant Rules under which

Plaintiffs were terminated specifically provide: "The Company reserves the right to take

the necessary disciplinary actions, up to and including termination, depending on the

severity and/or frequency of the incident(s)."  Exh. A to Leese Decl. ¶ 14.  The Company

thus was afforded discretion to determine an appropriate response to a violation of the

Plant Rules, and Plaintiffs have pointed to nothing in the CBA, the Associate Resource

Manual, or the Plant Rules that prohibited the Company from skipping progressive

discipline and immediately terminating employees like Plaintiffs who were found to have

violated Plant Rule No. 1.  While Plaintiffs fault the Company for failing to adequately

warn them that falsifying unemployment documents was a terminable offense, they again

have failed to point to any provision in the CBA that required the Company to provide

such a warning before termination.

Plaintiffs have also failed to establish that the Company's termination decisions were racially discriminatory and thus violative of the CBA.  In arguing that the Union acted in a discriminatory fashion throughout the grievance process, Plaintiffs reference the fact that out of the over fifty employees who were terminated following the Company's unemployment investigation, only three were white, and all of whom Plaintiffs allege were "African-American friendly." Pls.' Resp. at 50.  First, we note that this fact in isolation is insufficient to prove that SVC's termination decisions were racially discriminatory, especially considering that Plaintiffs have not presented any information regarding the racial make-up of the Indianapolis plant in order to place these raw numbers in context.  *See, e.g.*, *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 (7th Cir. 1997) (holding that raw statistics are insufficient to prove discrimination).  More importantly, it is undisputed that every employee was treated identically in connection with an, in particular, at the conclusion of the Company's unemployment investigation, namely, that, regardless of race, every employee who had been found by the DWD to have falsified unemployment documents was terminated, and every employee who the DWD determined had not engaged in falsification (including several non-white

employees) kept their jobs at SVC.[11]  Accordingly, there is no evidence that the Company's termination decisions were tainted by discrimination.[12]

Nor have Plaintiffs shown that there is anything else about the Company's termination decisions that ran contrary to the CBA, the Plant Rules, or the Associate Resource Manual.  It is undisputed that the Company investigated all SVC employees, not just Plaintiffs, and that both the DWD and SVC determined that Plaintiffs (as well as all other employees terminated as a result of the unemployment fraud investigation) had falsified unemployment records.  As Defendants have pointed out, a number of arbitrators have upheld employee terminations for unemployment fraud under a "just cause" standard.  *See, e.g.*, *Sanyo Manufacturing Corp.*, 121 BNA LA 91 (Arb. Nicholas, 2005) (employer had just cause to terminate two employees who provided false information to obtain unemployment benefits for weeks in which they worked for their employer);

---

[11] In November 2011, prior to the commencement of the Company's unemployment fraud investigation and the DWD's falsification determinations, David Schoreck, a white former Union representative, went to the unemployment office to report that he had made a mistake when filing for unemployment and promptly repaid the DWD overpayments.  Mr. Schoreck was not terminated or otherwise disciplined by SVC.  However, these facts are clearly distinguishable from the circumstances at bar as there is no evidence that any of the Plaintiffs took similar action to correct their mistakes prior to being under investigation by the DWD and the Company.

[12] Plaintiffs cite the deposition testimony of Mr. Beasley, who stated that SVC's former Senior Manager of Human Resources, Bob Badgley, the individual who initiated SVC's unemployment fraud investigation, had a history of treating white employees more favorably than non-white employees.  However, even if true, this testimony is immaterial as Ms. Leese, SVC's Human Resources Manager at the time of the investigation, was the primary investigator of the unemployment falsification claims and made the termination recommendations.  It is also undisputed that all of Leese's recommendations were reviewed and approved by SVC's Plant Director at the time, Edwin Wiley (African-American) and Human Resources Director, Andrea Coons (white).

*Ryder Integrated Logistics, Inc.*, 126 BNA LA 1725 (Arb. Daniel 2009) (employer had just cause to discharge employee for unemployment fraud).

Plaintiffs have testified that their errors were the result of inadvertent mistakes and/or confusion regarding, *inter alia*, filing for unemployment during holiday weeks, during weeks when they returned from layoff, and during unemployment waiting period weeks. Pls.' Resp. at 15-25. Any such assertions that were not previously proffered during the investigation phase of the case are not relevant to our review as they should have been presented for consideration to the company and the Union, and even the DWD. We note in any event that while Plaintiffs attempt to bolster their arguments by pointing to certain weeks of overpayments that they contend are the result of mistake or confusion, all but two of the Plaintiffs failed to proffer a specific explanation for every one of his or her overpayments in question, instead attempting to explain away the remaining weeks with the vague and conclusory defense that "other mistakes were unintentional." Pls.' Resp. at 35-38. More importantly, to the extent Plaintiffs provided these same explanations to the DWD, they were properly reviewed, but their justifications for their overpayments were found lacking as a defense. It was not unreasonable or in contravention of the CBA for the Company to rely on the DWD's determinations along with its own investigation in making its termination decisions.[13] Plaintiffs argue that

---

[13] Plaintiffs attempt to point to alleged inconsistencies in the investigation process, including alleging that the DWD purged older unemployment records, that the Company's charts of unemployment discrepancies do not exactly match the DWD's determinations, and that the Company failed to consistently follow the DWD's guideline that excuses individuals who have fewer than four weeks of overpayments. However, we agree with Defendants that these alleged inconsistencies do not show that the Company breached the CBA; if anything, they merely

their falsification "has to be intentional" to be a basis for termination, but nothing in the CBA, the Plant Rules, or the Associate Resource Manual requires a finding of intentional falsification.

In sum, by failing to meaningfully respond to the arguments set forth by the Union and the Company, Plaintiffs have waived their breach of contract claim.  Even if they had not waived their breach of contract claim, they have failed to present evidence establishing that any of the Company's termination decisions violated any provision of the CBA, the Plant Rules, or the Associate Resource Manual.

## III.    Conclusion

For the reasons detailed above, we hold that Plaintiffs have failed to establish that the Company breached the CBA when it terminated them for falsifying unemployment documents.  Because, in a hybrid claim like Plaintiffs', the claim against the Company and the claim against the Union are "inextricably interdependent," we need not address whether the Union breached its duty of fair representation in order to find that Plaintiffs' claims against both the Company and the Union do not survive summary judgment. Accordingly, Defendants' Motions for Summary Judgment are GRANTED.  Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date:      08/25/2015

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

demonstrate that the Company conducted a separate investigation from that of the DWD and still reached the same conclusion, namely, that all Plaintiffs falsified their unemployment records.

Distribution:

Marla Elizabeth Muse
marlamuse@aol.com

VANESSA  WRIGHT
7104 Vega Way
Apt. 237
Indianapolis, IN 46241

Heather L. Wilson
FROST BROWN TODD LLC
hwilson@fbtlaw.com

Daniel LaPointe Kent
LAPOINTE LAW FIRM P.C.
dkent@lapointelawfirm.com

Mary Jane Lapointe
LAPOINTE LAW FIRM PC
maryj@lapointelawfirm.com

Robert Adam Hicks
MACEY SWANSON & ALLMAN
rhicks@maceylaw.com

Richard J. Swanson
MACEY SWANSON AND ALLMAN
rswanson@maceylaw.com

Amanda M. Fisher
UNITED STEELWORKERS
afisher@usw.org

Mariana  Padias
UNITED STEELWORKERS
mpadias@usw.org

Cara J. Ottenweller
VEDDER PRICE P.C.
cottenweller@vedderprice.com

Thomas M. Wilde
VEDDER PRICE, P.C.
twilde@vedderprice.com